## AFFIDAVIT OF DAVID E. MACK

NOW COMES the Affiant, David E Mack of Dallas, Texas who is over the age of 21 years, competent to testify and has not been convicted of a felony or misdemeanor of moral turpitude or any felony criminal offense and declares as follows under penalty of perjury regarding case 4:15-cv-622 in the Eastern District of Texas:

1. That Affiant/Plaintiff is the owner of and in possession of the Samsung wireless phone that phone number 682-560-1675 is assigned to as shown in Exhibit 1 to Plaintiff/Affiant's Second Amended Complaint.

2. That Affiant/Plaintiff personally paid for the airtime for his Samsung wireless service with Tracfone for number 682-560-1675 and in doing so obtained the receipts for airtime shown as Exhibit 2 to Affiant/Plaintiff's Second Amended Complaint.

3. That Affiant/Plaintiff has been the owner of and had service on the Samsung wireless phone shown in Exhibit 1 to Affiant/Plaintiff's First Amended Complaint since July 15, 2013 and the phone has been in his custody and control at all times since that date to the present time.

4. That the call received by the Affiant/Plaintiff on January 17, 2014 at 8:02 AM on his wireless phone number 682-560-1675 was not made for an emergency purpose and Affiant/Plaintiff had not given Midland consent in **any** form to call that number.

5. Affiant/Plaintiff received previous calls to his wireless phone number 682-560-1675 from 877-237-0512 without his express consent where no message was left.

**Exhibit 3 Pg. 1**

6. That Affiant/Plaintiff **at or near the time of all calls** received to his wireless phone **from 877-237-0512 and other numbers** made handwritten notes as to the date, time, number calling, whether he answered, whether a live person was on the line or an automated message was received in addition to identification of the caller.

7. That the call received by Affiant/Plaintiff on his wireless phone number 682-560-1675 on January 17, 2014 at 8:02 AM was not the first call he received from 877-237-0512 but was actually the **97th** call out of a total of 113 calls he eventually received from that number on his wireless phone.

8. That Affiant/Plaintiff never had any previous contact with Midland Credit Management, Inc. in any form, verbal, written or electronic and has never had any business relationship with it at any time.

9. Affiant/Plaintiff is a non-debtor and there is no arbitration agreement in effect between Affiant/Plaintiff and any other party on any matter including but not limited to any debt.

10. That Affiant/Plaintiff has never forwarded or "ported" calls from any other number to his wireless phone number 682-560-1675 and any calls received on 682-560-1675 come directly from the calling party.

<u>Notary's Verification on Next Page</u>

Exhibit 3 Pg. 2

## NOTARY'S VERIFICATION

STATE OF TEXAS §
§
COUNTY OF DALLAS §

On this day personally came before me the above-named Affiant, who proved his identity to me to my satisfaction, and he acknowledged his signature on this Affidavit in my presence and stated that he did so with full understanding that he was subject to the penalties of perjury.

## AFFIRMATION

I hereby affirm that I prepared and have read this Affidavit and that I believe the foregoing statements in this Affidavit to be true and correct. I hereby further affirm that the basis of these beliefs is my own direct knowledge of the statements described herein.

Further the Affiant sayeth naught.

Signed in Dallas, Texas
September 11, 2015

_____
David E Mack

Name of Notary _Enrique Cramer_

Signature of Notary _____

My Commission Expires _9/27/16_

[Notary Seal: ENRIQUE DE JESUS GAMEZ-OLIVA, MY COMMISSION EXPIRES September 27, 2016]

**Exhibit 3 Pg. 3**



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T +1 202 637 5600
F +1 202 637 5910
www.hoganlovells.com

February 27, 2012

**VIA ELECTRONIC DELIVERY**

Marlene H. Dortch, Secretary
Federal Communications Commission
445 12th Street, SW
Room TWA325
Washington, DC 20554

Re:    Notice of *Ex Parte* Presentation
       CG Docket No. 02-278

Dear Ms. Dortch:

On Thursday, February 23, 2012, J. Brandon Black, President and Chief Executive Officer of Encore Capital Group, Inc. ("Encore"), along with Michele C. Farquhar and Mark W. Brennan of Hogan Lovells US LLP, counsel to Encore and Midland Credit Management, Inc. ("Midland"), a subsidiary of Encore, met with Mark Stone, Mike Jacobs, Kurt Schroeder, and Karen Johnson of the Consumer & Governmental Affairs Bureau regarding the Telephone Consumer Protection Act ("TCPA") and issues related to the use of predictive dialers.

During the meeting, the Encore and Midland representatives expressed support for Commission efforts to promote innovation and examine whether predictive dialers used for non-telemarketing purposes should be considered "automatic telephone dialing systems" (or "autodialers") under the TCPA. As described in more detail in the attached presentation that was distributed at the meetings, the representatives explained that the predictive dialers in use today provide significant benefits to businesses and consumers, such as:

- Protecting consumers from improper calls, including by restricting calls to certain numbers, certain individuals, certain hours, a certain number of times per telephone number, and a certain amount of time between calls;
- Allowing businesses with a legitimate need to contact a large number of specific consumers to do so accurately and efficiently;
- Promoting compliance with other statutes and regulations;
- Avoiding the risk of human dialing error; and
- Reducing costs for consumers and businesses.

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia. Hogan Lovells refers to the international legal practice comprising Hogan Lovells US LLP, Hogan Lovells International LLP, Hogan Lovells Worldwide Group (a Swiss Verein), and their affiliated businesses with offices in: Abu Dhabi Alicante Amsterdam Baltimore Beijing Berlin Boulder Brussels Caracas Chicago Colorado Springs Denver Dubai Dusseldorf Frankfurt Hamburg Hanoi Ho Chi Minh City Hong Kong Houston London Los Angeles Madrid Miami Milan Moscow Munich New York Northern Virginia Paris Philadelphia Prague Rome San Francisco Shanghai Silicon Valley Singapore Tokyo Warsaw Washington DC Associated offices: Budapest Jeddah Riyadh Zagreb

**Exhibit 4 pg 1**

Marlene H. Dortch, Secretary         - 2 -         February 27, 2012

In addition, the representatives discussed technical issues related to predictive dialers, including whether such equipment sold today includes the capacity to generate or dial random or sequential numbers.

The representatives also explained that allowing the use of predictive dialers for non-telemarketing purposes would not lead to an increase in the number of calls that consumers receive or impose additional costs on consumers, as callers can already make calls to those same consumers today through manual dialing. Moreover, now that almost one-third of all households only have wireless telephones (with that number expected to continue rising), blanket restrictions on calls to those telephone numbers are hindering innovation and significantly limiting the ability of companies to provide service to their customers and contact their accountholders. Finally, the representatives highlighted the skyrocketing number of TCPA claims and class actions involving alleged autodialer use, adding that TCPA class actions are increasingly targeting predictive dialer use.

The representatives described several actions that the Commission could take to distinguish predictive dialers from autodialers for purposes of TCPA regulation. For example, the Commission could eliminate predictive dialers that lack the capacity to generate or dial random or sequential numbers from the autodialer restriction. It could also find that, for predictive dialers that have the capacity to generate or dial random or sequential numbers, such dialers should not be treated as autodialers unless the caller actually uses the capacity to generate or dial random or sequential numbers. In addition, the Commission could revise the definition of "automatic telephone dialing system" and "autodialer" in its rules and add a new definition of "predictive dialer," as previously described by Encore.[1]

Pursuant to Section 1.1206(b) of the Commission's rules, I am filing this notice electronically in the above-referenced dockets. Please contact me directly with any questions.

Respectfully submitted,

/s/ Michele C. Farquhar

Michele C. Farquhar
Counsel to Encore Capital Group, Inc. and
Midland Credit Management, Inc.
Partner
michele.farquhar@hoganlovells.com
D 1+ 202 637 5663

cc: Mark Stone
Mike Jacobs
Kurt Schroeder
Karen Johnson

---

[1] See Ex Parte filing by Midland Credit Management, Inc. and Encore Capital Group, Inc., CG Docket No. 02-278, at 2 (filed Sept. 22, 2011).

**Exhibit 4 pg 2**



# The Need to Reexamine the Regulation of Predictive Dialers Under the TCPA

Encore Capital Group, Inc. and Midland Credit Management, Inc.

FCC Meeting
February 23, 2012

**Exhibit 4 pg 3**

There is an urgent need for the FCC to examine whether predictive dialers should always be considered "automatic telephone dialing systems" ("autodialers") under the Telephone Consumer Protection Act ("TCPA").

Exhibit 4 pg 4

# Overview

- Introduction
- Background on the TCPA, autodialers, and predictive dialers.
- The confusion caused by the FCC's 2003 and 2008 decisions.
- The benefits of today's innovative predictive dialers.
- Changed circumstances since the FCC's 2003 and 2008 decisions.
- Solution

**Exhibit 4 pg 5**

# Introduction

- Encore has a birds-eye view of how technology is improving our economy and our society.

    **In our business, <u>innovation is everything</u>.**

- Encore supports the FCC's efforts to make new technologies available to more consumers and businesses, thereby expanding economic and educational opportunities.
- Encore also supports the FCC's recent Robocall Report and Order, which affirms that the FCC does not want to discourage informational calls to consumers.

**Exhibit 4 pg 6**

## Background on the TCPA

- Congress enacted the TCPA specifically to curb aggressive <u>telemarketing</u> practices.
  - Using automatic dialing equipment to make hundreds of thousands of unsolicited calls to random or sequential telephone numbers.
  - Calling sequential telephone numbers in a way that ties up a block of telephone numbers and creates public safety risks.
- The TCPA was not intended to restrict businesses from placing informational and other non-telemarketing calls to their customers and accountholders, including on their wireless telephones.

**Exhibit 4 pg 7**

# Background on Autodialers and Predictive Dialers

- The TCPA defines an "automatic telephone dialing system" as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."
  - The TCPA restricts autodialed calls to wireless telephone numbers.
- A "predictive dialer" includes equipment that dials telephone numbers in a manner that predicts the time when a consumer will answer the telephone and an agent of the caller will be available to take the call.

Exhibit 4 pg 8

# The FCC's TCPA Decisions Have Created Confusion

- The FCC has distinguished between autodialed telemarketing calls and the use of predictive dialers for non-telemarketing calls.
- In the 2003 TCPA Order and 2008 Declaratory Ruling, however, the FCC determined that some predictive dialers are considered autodialers, creating confusion in the industry.
- The decisions have also resulted in skyrocketing class action litigation.
- The regulatory confusion / litigation environment is harming businesses <u>and</u> consumers.

**Exhibit 4 pg 9**

## The Benefits of Today's Predictive Dialers

- Predictive dialers are used to place a variety of non-telemarketing calls
  - Examples include appointment reminders, fraudulent activity / potential identity theft checks, payment confirmations, data security breach notifications, and pending insurance lapse courtesy calls.
  - The FCC recognized the value of these informational calls in the recent Robocall Report and Order.

**Exhibit 4 pg 10**

## The Benefits of Today's Predictive Dialers (cont'd)

- Promote consumer privacy.
- Protect consumers against improper calls and manual dialing errors.
- Increase productivity
- Lower costs for consumers.
- Facilitate regulatory compliance with Federal and State laws regarding consumer calls.

**Exhibit 4 pg 11**

# Circumstances Regarding Predictive Dialers Have Changed

- Predictive dialers are increasingly used for non-telemarketing purposes and are not used to generate or dial random or sequential numbers.
    - Encore and other companies that use predictive dialers to reach consumers have absolutely no need to generate or dial random or sequential numbers (nor can they benefit from such dialing).
- The current generation of predictive dialers are far more sophisticated devices than traditional autodialers and do not have the ability to generate or dial random or sequential numbers.
    - Under the FCC's current approach, even a typical smartphone could be considered an "autodialer."

**Exhibit 4 pg 12**

## Circumstances Regarding Predictive Dialers Have Changed (cont'd)

- There has also been a dramatic shift in the use of wireless telephones over the last decade (recognized by the FCC in its recent Robocall decision).
    - Today, wireless service is so inexpensive and accessible that it has replaced landline service for one-third of the U.S. population
    - Consumers can easily "port" their wireline number to their wireless device.

**Exhibit 4 pg 13**

## The Solution

The Commission should clarify that predictive dialers may be used for non-telemarketing purposes, especially when they are not used to generate or dial random or sequential numbers.

Exhibit 4 pg 14